**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH R. PSALMONDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV 95 DJS (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Joseph R. Psalmonds for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.

The cause was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of

Complaint.  (Document Number 13).   Defendant has filed a Brief in Support of the Answer.

(Doc. No. 15).

**Procedural History**

On August 25, 2003, plaintiff filed his applications for Disability Insurance Benefits and

Supplemental Security Income, claiming that he became unable to work due to his disabling

condition on October 21, 2001.[1] (Tr. 56-58, 214-18). Plaintiff's applications were denied

initially, and following an administrative hearing, plaintiff's claims were denied in a written

opinion by an Administrative Law Judge (ALJ), dated October 28, 2004. (Tr. 41-47, 219-25, 11-

20). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on April 23, 2005, after consideration of

additional evidence. (Tr. 9, 5-8). Thus, the decision of the ALJ stands as the final decision of the

Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on October 14, 2004. (Tr. 285). Plaintiff was

present and was represented by counsel. (Id.). The ALJ began by admitting a number of exhibits

into evidence. (Tr. 286). The ALJ stated that a vocational expert, Ms. Susan Shea, was present

and would testify. (Id.). The ALJ noted that plaintiff filed a prior application for benefits, which

was denied on April 26, 2003 by an ALJ, and that res judicata applied to the period prior to that

date. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he is 32 years of age, is

married, and has no children. (Tr. 287). Plaintiff stated that he completed twelfth grade, can read

and write, and has never been in the military. (Id.). Plaintiff testified that he is five-feet, five

inches tall and weighs 328 pounds. (Tr. 287-88). Plaintiff stated that his normal weight is about

280 pounds. (Tr. 288). Plaintiff attributed his weight gain to an inability to ambulate due to back

---

[1]Plaintiff filed prior applications on November 5, 2001. (Tr. 14). These applications were
denied in a decision by an Administrative Law Judge (ALJ) dated April 26, 2003. (Id.). As such,
the ALJ found that the issue of plaintiff's alleged disability through April 26, 2003 is res judicata
in the instant case.

and leg impairments.  (Id.).  Plaintiff testified that he last worked in 2001 stacking lumber at Oak Ridge Pallet.  (Id.).  Plaintiff stated that he left that job because his arms and legs "gave out." (Id.).

Plaintiff testified that is "somewhat" able to take care of his personal hygiene.  (Tr. 288-89).  Plaintiff stated that he has difficulty shaving and tying his shoes due to arm and back problems.  (Tr. 289).  Plaintiff testified that he is able to bathe and dress himself.  (Id.).  Plaintiff stated that he is unable to do most work around the house.  (Id.).  Plaintiff testified that he can do dishes only if he sits in a chair in front of the sink.  (Id.).  Plaintiff stated that his wife works during the day and that he is unable to vacuum and make beds.  (Tr. 289-90).  Plaintiff testified that his mother and his sister-in-law, who live nearby, help him with housework.  (Tr. 290).  Plaintiff stated that he is unable to do yard work or take out trash that weighs more than 10 to 20 pounds.  (Id.).

Plaintiff testified that he has a valid driver's license but his doctor recommended that he drive slowly because he has bad vision in his left eye and his legs give out.  (Id.).  Plaintiff stated that his father drove him to the hearing from his home in Van Buren.  (Id.).  Plaintiff testified that most of his doctors are located in the Poplar Bluff area.  (Tr. 291).  Plaintiff stated that his father takes him to his doctor appointments.  (Id.).  Plaintiff testified that his wife does the household grocery shopping.  (Id.).  Plaintiff stated that he is unable to shop for groceries due to his anxiety and his inability to walk around.  (Id.).

Plaintiff testified that his back, hips, and legs cause him pain and discomfort.  (Id.).  Plaintiff stated that he experiences back pain above his belt line due to osteoporosis, bulging disks, and a herniated disk.  (Id.).  Plaintiff testified that his doctors have told him that there is

nothing they can do surgically for his back. (Id.). Plaintiff stated that he experiences back pain every day, which feels like a "hot rod" down the center of his spine. (Tr. 292). Plaintiff testified that cold weather, activity, and sitting increase his back pain, while lying down on his stomach for twenty minutes decreases the pain. (Id.). Plaintiff stated that he takes pain medication and muscle relaxers for his back pain. (Id.). Plaintiff testified that Dr. Bradford recommended that he start walking with a cane or walker. (Id.).

Plaintiff testified that he experiences constant hip pain, which he described as tension on his hip bone. (Tr. 293). Plaintiff stated that the duration of his pain varies depending on the weather. (Id.). Plaintiff testified that cold weather increases his hip pain, while pain medication and hot towels decrease the pain. (Id.).

Plaintiff testified that he experiences a constant sharp, burning pain in his legs, with occasional numbness. (Tr. 293-94). Plaintiff stated that standing and sitting for longer than twenty minutes increases his pain. (Tr. 294). Plaintiff testified that Dr. Bradford has recommended that he lose weight and that he is working with her to do so. (Id.).

Plaintiff testified that he experiences pain in his left shoulder due to a rotator cuff tear sustained in 2000. (Id.). Plaintiff stated that the tear was surgically repaired twice. (Id.). Plaintiff explained that the range of motion in his left arm is restricted. (Tr. 294-95).

Plaintiff testified that he can sit and stand for 15 to 20 minutes before his legs and back begin to hurt. (Tr. 295). Plaintiff stated that he cannot stoop, squat, bend, or crawl without experiencing problems. (Id.). Plaintiff testified that he can only walk about half of a city block. (Id.). Plaintiff stated that he tries to walk around his home, although his doctor advised him not to "over do it" due to his heart being enlarged. (Id.). Plaintiff testified that he is right-handed and

that he can lift 20 to 30 pounds with his right hand.  (Tr. 296).  Plaintiff stated that he can lift 10 to 15 pounds with his left hand.  (Id.).

Plaintiff testified that some of the medications he takes have side-effects.  (Id.).  Plaintiff stated that some of his medications cause weight gain.  (Id.).  Plaintiff testified that his psychiatric medications cause sexual dysfunction.  (Id.).  Plaintiff stated that his medications also "spaces [him] out sometimes."  (Id.).  Plaintiff explained that he cannot always think clearly while taking the medications.  (Id.).  Plaintiff stated that his doctors advised hi not to drive much while taking his medications.  (Tr. 297).

Plaintiff testified that in a typical day, he wakes up at about 6:00 a.m.  (Id.).  Plaintiff stated that from 6:00 a.m. to 12:00 p.m. he listens to the radio, watches television, and then moves around the house to get exercise.  (Id.).  Plaintiff testified that he used to have farm animals that he fed but he had to sell them because he became unable to care for them.  (Id.).  Plaintiff stated that from 12:00 p.m to 6:00 p.m. he goes outside and tries to walk down the road.  (Tr. 298).  Plaintiff testified that he has to stop about four times to rest in order to walk a quarter of a mile.  (Id.).  Plaintiff stated that from 6:00 p.m. until he goes to bed, he watches television and tries to wash the dishes while sitting in a chair.  (Id.).  Plaintiff testified that he spends about 75 percent of an average day lying down to ease the pain in his back and legs.  (Id.).

Plaintiff stated that he typically goes to bed at around 9:00 p.m.  (Id.).  Plaintiff testified that he experiences difficulty falling asleep, due to the pain in his back and legs.  (Id.).  Plaintiff stated that he takes sleep medication, which does not help.  (Tr. 299).  Plaintiff testified that he wakes up during the night due to pain in his back and legs.  (Id.).  Plaintiff stated that he gets up during the night to stretch his legs and to take pain medication.  (Id.).

Plaintiff testified that he has Type II diabetes. (Id.). Plaintiff stated that he takes pills to control his diabetes. (Id.).

Plaintiff stated that he has high blood pressure. (Id.). Plaintiff testified that he takes medication for this condition, which controls his blood pressure. (Id.).

Plaintiff testified that he has been diagnosed with osteoporosis. (Id.). Plaintiff stated that this condition has worsened within the past year. (Tr. 300).

Plaintiff testified that he also takes medication for depression. (Id.). Plaintiff stated that he sees a psychiatrist and a counselor for his depression. (Id.). Plaintiff testified that his depression is caused by his inability to work. (Id.).

Plaintiff testified that he does not believe he is able to return to any of his former jobs. (Id.). Plaintiff stated that he can no longer work at his position at the sawmill because he is unable to stand or bend. (Id.). Plaintiff testified that he cannot work at a past position at a battery manufacturer because that job requires prolonged standing and stooping. (Id.). Plaintiff stated that he cannot work at a past position doing powder coating because that position required standing for eight-hours. (Id.). Plaintiff testified that also worked at Royal Furniture, where his wife currently works, as an inspector. (Tr. 300-01). Plaintiff stated that he can no longer perform that position because it required lifting furniture. (Tr. 301).

Plaintiff testified that there is a history in his family of diabetes, heart disease, osteoporosis, and high blood pressure. (Id.).

Plaintiff stated that he used to enjoy hunting and fishing but he can no longer engage in these hobbies due to his impairments. (Id.). Plaintiff testified that he does not belong to any church or civic organizations. (Id.). Plaintiff testified that he watches some television but he

cannot follow the storyline because he experiences difficulty concentrating. (Tr. 301-02).

Plaintiff testified that he has no income other than his wife's income from working at Royal Furniture. (Tr. 302). Plaintiff stated that he has been receiving Medicaid benefits for three years, which pays for his medical care. (Id.).

The ALJ then examined plaintiff, who testified that he can stand or walk about 10 to 15 minutes at a time, and under an hour total in an 8-hour workday. (Id.). Plaintiff stated that he can sit a total of maybe two hours in an eight-hour day. (Id.). Plaintiff testified that his back and legs have gotten worse since the last ALJ rendered his decision in April of 2003. (Tr. 303). Plaintiff stated that nothing traumatic happened since that time, and he has not had any surgeries since then. (Id.).

The ALJ next examined the vocational expert, Susan Shea, who testified that all of plaintiff's past relevant work was at least medium in nature. (Tr. 304). The ALJ asked the vocational expert to assume a hypothetical individual who is 32, has a 12th grade education, is capable of performing light work with mild pain, can occasionally climb, balance, stoop, kneel, crouch, and crawl; and has mild to moderate mental limitations for understanding and remembering tasks, sustained concentration and persistence, socially interacting with the general public, and adapting to work place changes. (Tr. 304-05). The ALJ asked the vocational expert whether such an individual could perform any entry-level work. (Tr. 305). Ms. Shea testified that there are a limited number of cashiering jobs that such an individual could perform. (Id.). Ms. Shea stated that at the light level, such an individual could perform almost all of the cashiering jobs, and that there are at least 8,000 of such jobs in the state of Missouri. (Id.). Ms. Shea testified that the individual could also perform rental clerking jobs and that at least 5,000 such

jobs exist in Missouri. (Id.). Ms. Shea stated that the individual could also perform light janitorial jobs and that there are at least 3,000 such jobs in Missouri. (Id.). Finally, Ms. Shea testified that the individual could perform light lawn work and that at least 2,000 such jobs exist in Missouri. (Id.).

Ms. Shea testified that the hypothetical individual could also perform sedentary assembly jobs and that at least 10,000 such jobs exist in Missouri. (Id.). Ms. Shea stated that the individual could also perform sedentary handwork positions, and that at least 5,000 of such positions exist in Missouri. (Tr. 306). Ms. Shea testified that the individual could not perform these jobs if he were markedly limited in mental functions. (Id.). Ms. Shea stated that if plaintiff's physical and mental complaints were fully credible then he could not perform any of the jobs that she mentioned. (Id.).

Plaintiff testified that his anxiety and depression prevent him from going into stores with his wife. (Id.). The ALJ stated that he was aware that this was part of plaintiff's condition. (Id.). Plaintiff's attorney indicated that he did not know of any additional exhibits to add to the record. (Tr. 307). The ALJ then concluded the hearing. (Id.).

**B.    Relevant Medical Records**[2]

The record reveals the plaintiff presented to the Family Counseling Center on October 23, 2001, complaining of depression, mood swings, irritability, and uneasiness around crowds of people. (Tr. 176). The therapist described plaintiff's mood as depressed and anxious. (Tr. 183).

---

[2]Although res judicata has been applied to the period before October 10, 2002, medical evidence prior to this date may be considered insofar as it serves as a background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding. See Robbins v. Secretary of Health and Human Services, 895 F.2d 1223, 1224 (8th Cir. 1990) (per curiam).

Plaintiff's intellectual functioning was described as good. (Tr. 185). Plaintiff was diagnosed with major depressive disorder[3] with panic disorder[4] and agoraphobia.[5] (Id.). A GAF[6] of 50[7] was assessed. (Id.). Therapy was recommended. (Tr. 186).

On January 21, 2002, plaintiff presented to Kimberly Schisler, D.O.. (Tr. 106). Dr. Schisler's assessment was hypertension;[8] non-insulin-dependent diabetes mellitus (NIDDM)[9] with

---

[3]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Diagnostic criteria for a major depressive episode include a depressed mood, a marked reduction of interest or pleasure in virtually all activities, or both, lasting for at least 2 weeks. In addition, 3 or more of the following must be present: gain or loss of weight, increased or decreased sleep, increased or decreased level of psychomotor activity, fatigue, feelings of guilt or worthlessness, diminished ability to concentrate, and recurring thoughts of death or suicide. See Stedman's Medical Dictionary, 478 (27th Ed. 2000).

[4]Recurrent panic attacks that occur unpredictably. Stedman's at 527.

[5]A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks. Stedman's at 37.

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[8]High blood pressure. Stedman's at 855.

[9]An often mild form of diabetes mellitus of gradual onset, usually in obese individuals over age 35. See Stedman's at 491.

good control; and sinusitis.[10]  (Id.).  Dr. Schisler continued plaintiff on his Zyprexa[11] and Paxil[12]

and added medications for his sinusitis.  (Id.).

On April 3, 2002, plaintiff presented to Dr. German Zhitlovsky at the Family Counseling

Center for therapy.  (Tr. 175).  Plaintiff reported improvement.  (Id.).  Plaintiff indicated that he

attended church the previous Sunday.  (Id.).  Dr. Zhitlovsky noted that plaintiff tolerated Paxil

well.  (Id.).  Dr. Zhitlovsky increased plaintiff's dosage of Paxil and started plaintiff on Zyprexa.

(Id.).  On April 24, 2002, plaintiff complained of periods of feeling numb and lacking energy.

(Tr. 174).  Dr. Zhitlovsky added Effexor.[13]  (Id.).  On May 7, 2002, plaintiff reported a slight

improvement.  (Tr. 173).  Dr. Zhitlovsky increased plaintiff's dosage of Effexor.  (Id.).

Plaintiff presented to Dr. Schisler on May 10, 2002, complaining of arthralgia[14] that had

been occurring for about two weeks in his shoulders, hands, wrists, knees and hips.  (Tr. 104).

Dr. Schisler's assessment was arthralgia; NIDDM; and hypertension stable.  (Id.).  Dr. Schisler

noted that plaintiff does not have any polyuria[15] or polydipsia.[16]  (Id.).  Dr. Schisler continued

---

[10]Inflammation of the mucous membrane of any sinus.  Stedman's at 1645.

[11]Zyprexa is a psychotropic drug indicated for the treatment of bipolar disorder, schizophrenia, and agitation associated with schizophrenia and mania.  See Physician's Desk Reference (PDR), 1899-2000 (59th Ed. 2005).

[12]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive compulsive disorder, panic disorder, social anxiety disorder, and generalized anxiety disorder.  See PDR at 1585-86.

[13]Effexor is indicated for the treatment of major depressive disorder.  See PDR at 3321.

[14]Pain in a joint, especially one not inflammatory in character.  Stedman's at 149.

[15]Excessive excretion of urine resulting in profuse and frequent micturition.  Stedman's at 1426.

[16]Excessive thirst that is relatively prolonged.  Stedman's at 1420.

plaintiff on Celebrex.[17]  (Id.).

On May 23, 2002, plaintiff complained of anxiety attacks.  (Tr. 172).  Dr. Zhitlovsky increased plaintiff's dosage of Paxil, continued the Effexor, prescribed BuSpar[18] and Zyprexa.  (Id.).  On June 5, 2002, plaintiff reported experiencing outbreaks of anger.  (Tr. 171).  Dr. Zhitlovsky discontinued the Paxil, and continued the Zoloft, BuSpar, Zyprexa, and Effexor.  (Id.).  On June 26, 2002, plaintiff reported an improvement yet reported experiencing periods of unexplained anxiety.  (Tr. 170).  Dr. Zhitlovsky increased plaintiff's dosage of Zoloft,[19] and continued the BuSpar, Effexor, and Zyprexa.  (Id.).

Plaintiff presented to the Pain Management Center on August 14, 2002, upon the referral of Dr. Schisler, for evaluation and treatment of his low back pain and bilateral lower extremity pain.  (Tr. 139).  Plaintiff complained of a constant burning pain and numbness in his low back that radiates to his bilateral lower extremities, along with left shoulder pain.  (Id.).  Upon physical examination, Yuli Soeter, M.D., reported tenderness to palpation at L[20]4-4,[21] S[22]1, as well as left

---

[17]Celebrex is indicated for the relief of the signs and symptoms of osteoarthritis.  See PDR at 3096.

[18]BuSpar is indicated for the treatment of anxiety.  See PDR at 2578.

[19]Zoloft is indicated for the treatment of major depressive disorder, obsessive compulsive disorder, panic disorder, and social anxiety disorder.  See PDR at 2682-83.

[20]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's at 956.

[21]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[22]Abbreviation for sacral vertebra (S1 to S5).  Stedman's at 1586.

paramedian tenderness at the same level. (Tr. 140). Dr. Soeter stated that a lumbar x-ray revealed central disc bulging at L4-5 and mild central disc bulging at L5-S1. (Id.). Dr. Soeter's assessment was low back pain and bilateral lower extremity pain. (Id.). Dr. Soeter administered an epidural steroid injection. (Id.).

On August 20, 2002, plaintiff saw Talia Haiderzad, M.D., at the Family Counseling Center for therapy. (Tr. 169). Plaintiff reported feeling depressed, hopeless, and irritable. (Id.). Dr. Haiderzad continued plaintiff's medication regimen. (Id.).

Plaintiff presented to Dr. Schisler on August 23, 2002 complaining of elbow pain that started three to four days prior to his visit. (Tr. 102). Dr. Schisler's diagnosis was NIDDM, uncontrolled; hypertension; and lateral epicondylitis[23]/tendinitis.[24] (Id.). Dr. Schisler prescribed Vioxx[25] and Darvocet.[26] (Id.). Plaintiff saw Dr. Schisler on September 3, 2002, at which time plaintiff complained of pain and numbness in his hand. (Id.). Dr. Schisler's assessment was hypertension; tennis elbow;[27] mood swings; and NIDDM, uncontrolled. (Id.). Dr. Schisler continued plaintiff on his medications, gave him a steroid pack, and prescribed physical therapy. (Id.).

On September 11, 2002, plaintiff reported insignificant relief from the epidural steroid

_____

[23]Inflammation of the elbow. Stedman's at 603.

[24]Inflammation of a tendon. Stedman's at 1794.

[25]Vioxx is indicated for relief of the signs and symptoms of osteoarthritis. See PDR at 2174.

[26]Darvocet is indicated for the relief of mild to moderate pain. See PDR at 402.

[27]Chronic inflammation of the elbow as a result of unusual or repetitive strain. See Stedman's at 573.

- 12 -

injection.  (Tr. 137).  Dr. Soeter's assessment was low back pain; lower extremity radicular pain symptoms; bilateral lower extremity numbness; and history of diabetes.  (Id.).  Dr. Soeter administered another epidural steroid injection.  (Id.).

Plaintiff saw Dr. Schisler on September 17, 2002, for a follow-up.  (Tr. 100).  Plaintiff indicated that he has been going to the Mental Health Center and he is not feeling any better.  (Id.).  Dr. Schisler's assessment was depression; anxiety; NIDDM, uncontrolled; and hypertension.  (Id.).  Dr. Schisler adjusted plaintiff's medications and started him on Valium[28] and Ativan.[29]  (Id.).

On October 15, 2002, plaintiff reported that his low back pain is "completely resolved," although he complained about bilateral arm and lower extremity numbness.  (Tr. 133).  Dr. Soeter's assessment was low back pain; lower extremity radicular pain symptoms, resolved; bilateral upper and lower extremity numbness, responding to Neurontin;[30] history of diabetes; and muscle spasm.  (Id.).  Dr. Soeter administered a trigger point injection and continued plaintiff on Neurontin.  (Id.).

Plaintiff saw Dr. Schisler for a follow-up on October 22, 2002, at which time plaintiff reported that he was doing "fairly well."  (Tr. 96).  Dr. Schisler noted that plaintiff's blood sugar readings were well within the normal range and that plaintiff's mood was good.  (Id.).  Dr. Schisler's diagnosis was NIDDM; depression; and anxiety.  (Id.).  Dr. Schisler continued plaintiff

---

[28]Valium is indicated for the management of anxiety disorder or for the short-term relief of the symptoms of anxiety.  See PDR at 2957.

[29]Ativan is indicated for the relief of anxiety.  See PDR at 2213.

[30]Neurontin is indicated for the management of postherpetic neuralgia.  See PDR at 2590.

on his medications.  (Id.).

On November 7, 2002, plaintiff reported experiencing difficulty sleeping and agitation. (Tr. 168).  Dr. Haiderzad adjusted plaintiff's medications.  (Id.).

On November 8, 2002, plaintiff reported that his bilateral upper and lower extremity numbness was resolved with the Neurontin, yet he still experienced difficulty with his low back. (Tr. 132).  Dr. Soeter's assessment was low back pain; lower extremity radicular pain symptoms; bilateral upper and lower extremity numbness, responding to Neurontin; history of diabetes; and muscle spasm.  (Id.).  Dr. Yuli Soeter continued the Neurontin and indicated that he would discuss a possible diskography[31] for plaintiff's low back pain with Dr. Benjamin H. Soeter.  (Id.).

Plaintiff saw Dr. Schisler on November 19, 2002 for a follow-up, at which time plaintiff reported feeling worried and not sleeping well.  (Tr. 95).  Dr. Schisler's assessment was NIDDM, good control; bronchitis; mood swings; and hypertension.  (Id.).  Dr. Schisler re-started plaintiff on Zyprexa.  (Id.).

Plaintiff saw Dr. Benjamin H. Soeter on December 9, 2002.  (Tr. 131).  Dr. Soeter's assessment was low back pain; lower extremity radicular symptoms; herniated disc at L4-5 L5-S1; diabetic neuropathy;[32] and muscle spasm.  (Id.).  Dr. Soeter increased plaintiff's Neurontin, discussed diskography and nucleoplasty[33] with plaintiff and scheduled a diskography.  (Id.).

---

[31]Radiographic demonstration of intervertebral disk by injection of contrast media into the nucleus pulposus.  Stedman's at 524.

[32]The most common of the chronic complications of diabetics can affect either the peripheral or the autonomic nervous system, or both.  Stedman's at 1212.

[33]Nucleoplasty uses radiofrequency energy to break molecular bonds within tissue, creating small channels in the disc.  See Stedman's at 524.

Plaintiff saw Dr. Schisler on December 17, 2002, at which time he reported that the Zyprexa did not help him sleep, although he was doing fairly well otherwise. (Tr. 94). Dr. Schisler noted that plaintiff's blood sugars were "doing good." (Id.). Dr. Schisler's assessment was IDDM, good control; mood swings; and insomnia. (Id.). Dr. Schisler increased plaintiff's Serzone[34] at bedtime, started him on Trazodone,[35] stopped the Zyprexa, and continued his diabetic medications. (Id.).

On December 23, 2002, plaintiff reported that he was feeling better but was still experiencing difficulty sleeping. (Tr. 167). Dr. Haiderzad increased plaintiff's dosage of Effexor and added Trazodone. (Id.).

Plaintiff saw Dr. Yuli Soeter on January 8, 2003, at which time plaintiff reported that the increased dosage of Neurontin provided significant relief of his bilateral lower extremity numbness, although he continues to experience low back pain. (Tr. 130). Dr. Soeter increased plaintiff's dosage of Neurontin. (Id.).

On January 13, 2003, Dr. Schisler reported that plaintiff was "doing fairly well." (Tr. 93). Dr. Schisler's assessment was hypertension; NIDDM; upper respiratory infection; and low back pain. (Id.). Dr. Schisler continued plaintiff's medications. (Id.).

Plaintiff underwent a diskography on January 22, 2003. (Tr. 128). Plaintiff's pre-operative diagnosis was herniated disc, L4-5, L5-S1. (Id.). Dr. Ben Soeter found pain generated at L4-5. (Id.). Plaintiff's post-operative diagnosis was herniated disc, L4-5, L5-S1. (Id.). On February 5, 2003, Phyllis Hansen, a nurse practitioner, stated that plaintiff reported no relief from

---

[34]Serzone is indicated for the treatment of depression. See PDR at 2213.

[35]Trazodone is indicated for the treatment of depression. See PDR at 3296.

the diskography, although she believed that plaintiff did not understand that the procedure was a trial and the pain generator was found. (Tr. 126). Ms. Hansen's assessment was status post diskography with L4-5 pain generator being found. (Id.). Ms. Hansen stated that plaintiff's Neurontin will be refilled be Dr. Yuli Soeter. (Id.). Ms. Hansen indicated that plaintiff will be scheduled for nucleoplasty with Dr. Ben Soeter. (Tr. 127).

Plaintiff presented to Dr. Schisler on February 10, 2003, complaining of a burning sensation across his chest that comes and goes. (Tr. 92). Plaintiff underwent an EKG,[36] which was unremarkable. (Id.). Dr. Schisler expressed the opinion that plaintiff's symptoms are from his stomach and stress. (Id.). Dr. Schisler's assessment was hypertension; NIDDM; and GERD.[37] (Id.). Dr. Schisler started plaintiff on Nexium.[38] (Id.).

On February 20, 2003, plaintiff saw Dr. Haiderzad for therapy. (Tr. 166). Plaintiff reported that he is getting better and that he is sleeping well. (Id.). Dr. Haiderzad increased plaintiff's dosage of Effexor. (Id.).

On March 5, 2003, plaintiff underwent nucleoplasty. (Tr. 124). Dr. Benjamin Soeter reported that plaintiff tolerated the procedure well. (Tr. 125). On March 21, 2003, Debbie Russell, a nurse practitioner, reported that plaintiff received significant relief in the low back and lower extremities from the nucleoplasty. (Tr. 122). Plaintiff indicated that he continues to

---

[36]Abbreviation for electrocardiogram, which is a graphic record of the heart's integrated action currents obtained with the electrocardiograph displayed as voltage changes over time. Stedman's at 573.

[37]Abbreviation for gastroesophageal reflux disease, which is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 514.

[38]Nexium is indicated for the treatment of GERD. See PDR at 623.

experience some tingling sensation that radiates down the lower extremities and into the scrotum. (Id.). Ms. Russell's assessment was status post diskography/nucleoplasty, good results; and diabetic neuropathy. (Id.). Ms. Russell increased plaintiff's dosage of Neurontin. (Tr. 123).

On March 10, 2003, plaintiff saw Dr. Schisler for a follow-up, at which time he reported that he was doing somewhat better after quitting smoking. (Tr. 91). Dr. Schisler's assessment was hypertension; NIDDM, improved; allergies; and sinusitis. (Id.). Dr. Schisler scheduled a CT scan. (Id.).

Plaintiff saw Dr. Haiderzad for therapy on March 19, 2003. (Tr. 165). Plaintiff reported that he was doing well, although he felt big on the outside yet very small in the inside. (Id.). Dr. Haiderzad interpreted plaintiff's comments as self-esteem issues. (Id.). Dr. Haiderzad increased plaintiff's dosage of BuSpar. (Id.). On April 9, 2003, plaintiff reported that his feelings of small on the inside were getting better. (Tr. 164). Dr. Haiderzad increased plaintiff's dosage of Trazodone. (Id.).

On April 18, 2003, plaintiff reported that he experiences dull pain in his back and tingling in his legs. (Tr. 120). Upon physical examination, Ms. Hansen found on tenderness in plaintiff's back. (Id.). Ms. Hansen indicated that another MRI may be necessary. (Tr. 121).

On May 16, 2003, plaintiff complained of pain in the distal thoracic back that radiates down the lower back down to the lower extremities. (Tr. 118). Upon physical examination, Ms. Russell found that plaintiff's motor strength was 5/5 and sensation was intact to light touch. (Id.). Ms. Russell's assessment was thoracic back pain; low back pain with lower extremity radicular pain symptoms; and polyneuropathy.[39] (Tr. 119). Ms. Russell continued plaintiff on the

---

[39]A nontraumatic generalized disorder of peripheral nerves. Stedman's at 1422.

Neurontin and recommended obtaining a new MRI of the thoracic and lumbar region to rule out any pathology.  (Id.).

Plaintiff presented to Ms. Russell at the Pain Management Center on May 27, 2003, to review the findings of the MRI.  (Tr. 116).  The MRI of the lumbosacral spine was within normal limits.  (Tr. 160).  Plaintiff reported pain in the low back region that radiates down the posterior buttocks, and posterior thighs halfway down to the knee.  (Id.).  Ms. Russell noted that plaintiff ambulated without difficulty or discomfort.  (Tr. 116).  Plaintiff's motor strength was 5/5, and no clubbing, discoloration or edema was noted.  (Id.).  Ms. Russell continued the Neurontin, started plaintiff on Lidoderm patches,[40] and recommended that plaintiff start physical therapy.  (Tr. 117).

Plaintiff saw Mina Bradford, M.D. on July 10, 2003.  (Tr. 150).  Plaintiff reported that Glucophage was causing nausea in the mornings.  (Id.).  Dr. Bradford's assessment was diabetes mellitus, hypertension, depression, GERD, and asthma.  (Id.).  Dr. Bradford decreased plaintiff's dosage of diabetic medication.  (Id.).

Plaintiff saw Dr. Haiderzad for therapy on July 17, 2003, at which time plaintiff reported feeling 90 percent better since starting his current medication regimen.  (Tr. 163).  Dr. Haiderzad described plaintiff's affect as pleasant.  (Id.).

On July 25, 2003, plaintiff reported experiencing pain in his lower back since falling out of bed two weeks prior to his appointment.  (Tr. 114).  Plaintiff indicated that he went to the emergency room but was told that there was nothing wrong with his back.  (Id.).  Plaintiff's motor strength was 5/5 in his lower extremities, and sensation was intact to light touch.  (Id.).

---

[40]The lidoderm patch is comprised of lidocaine, and is indicated for relief of pain associated with post-herpetic neuralgia.  See PDR at 1215-16.

Ms. Russell continued plaintiff on the Neurontin and Vioxx, added Flexeril,[41] and recommended obtaining another MRI due to plaintiff's new back injury and increased back pain. (Id.).

On July 29, 2003, plaintiff reported that the Glucophage was still causing nausea and vomiting. (Tr. 149). Dr. Bradford's assessment was Type II diabetes mellitus and hypertension. (Id.). Dr. Bradford adjusted plaintiff's diabetic medications, and made an appointment for plaintiff to see a diabetes educator. (Id.).

Plaintiff presented to Ms. Russell on August 6, 2003, at which time he continued to complain of pain in the lower back region that radiates down the anterior and posterior aspects of the lower extremities down to the ankles. (Tr. 111). Plaintiff's motor strength was 5/5 in his lower extremities, an sensation was intact to light touch. (Id.). Ms. Russell recommended a lumbar epidural steroid injection and trigger point injections. (Tr. 112). Ms. Russell also recommended physical therapy, but plaintiff indicated that it was not available in his small town and he had transportation problems. (Id.). Dr. Yuli Soeter administered an epidural steroid injection and trigger point injection on this date. (Tr. 113).

On August 12, 2003, plaintiff reported that he was tolerating Avandemet and that he had only occasional low blood sugar in the morning that was relieved with juice or crackers. (Tr. 146). Dr. Bradford's assessment was Type II diabetes mellitus and hypertension. (Id.).

On August 27, 2003, plaintiff reported that he experienced about 20 percent relief with the epidural steroid injection, and that he continues to have pain in the low back that radiates down to his ankle. (Tr. 108). Plaintiff's motor strength was 5/5 in both his upper and lower extremities,

---

[41]Flexeril is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

and sensation was intact to light touch.  (Id.).  Ms. Russell continued plaintiff on the Flexeril and

Neurontin, and recommended another epidural steroid injection and trigger point injection.

(Tr. 109).  Dr. Benjamin Soeter administered an epidural steroid injection and trigger point

injection on that date.  (Tr. 110).

On September 12, 2003, plaintiff reported that he was "feeling well," had his blood sugars

under much better control, and was walking for exercise.  (Tr. 144).  Dr. Bradford's assessment

was Type II diabetes mellitus, hyperlipidemia,[42] osteoporosis[43] of the spine, and hypertension.

(Id.).  Dr. Bradford advised plaintiff to continue taking his medications.  (Id.).

Plaintiff presented to Dr. Haiderzad for therapy on September 15, 2003, at which time

plaintiff reported that his medications are working.  (Tr. 162).  Plaintiff described experiencing

occasional feelings where he is in a room yet feels like he is all over the building.  (Id.).  Dr.

Haiderzad stated that plaintiff carries a diagnosis of schizophrenia.[44]  (Id.).  Dr. Haiderzad

described plaintiff's affect as pleasant and his speech clear.  (Id.).  Dr. Haiderzad started plaintiff

on Seroquel[45] and decreased the Zyprexa.  (Id.).

A state agency medical consultant completed a Physical Residual Functional Capacity

Assessment on October 10, 2003. (Tr. 187-95).  The medical consultant expressed the opinion

---

[42]Elevated levels of lipids in the blood plasma.  Stedman's at 850.

[43]Reduction in the quantity of bone or atrophy of skeletal tissue.  Stedman's at 1285.

[44]A common type of psychosis, characterized by abnormalities in perception, content of thought, and thought processes and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life.  Stedman's at 1600.

[45]Seroquel is a psychotropic drug indicated for the treatment of bipolar mania and schizophrenia.  See PDR at 663.

that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 188). The consultant further found that plaintiff could occasionally climb ladders, ropes, or scaffolds; and stoop; and could frequently climb ramps or stairs, balance, kneel, crouch, and crawl. (Tr. 190). The consultant found no manipulative, visual, communicative, or environmental limitations. (Tr. 191-92).

State Agency Medical Consultant Marsha J. Toll, Pys.D. completed a Psychiatric Review Technique on October 10, 2003. (Tr. 196-208). Dr. Toll expressed the opinion that plaintiff's depression and anxiety cause moderate limitations in his ability to maintain social functioning and ability to maintain concentration, persistence, or pace; mild limitations in his activities of daily living; and no repeated episodes of decompensation. (Tr. 206). Dr. Toll also completed a Mental Residual Functional Capacity Assessment. (Tr. 210). Dr. Toll found that there was no evidence of limitation in plaintiff's ability to ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; or set realistic goals and make plans independently of others. (Id.). Dr. Toll expressed the opinion that plaintiff's understanding and memory; ability to carry out very short and simple instructions; ability to carry out detailed instructions; ability to perform activities within a schedule; ability to sustain an ordinary routine; ability to make simple work-related decisions; ability to complete a normal workday without interruptions from psychologically based symptoms; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers; ability to maintain socially appropriate behavior; ability to respond appropriately to changes in the work setting; and ability to travel in unfamiliar places or use public transportation were not significantly limited by his

mental impairments.  (Tr. 210-11).  Dr. Toll found that plaintiff's ability to maintain attention and concentration for extended periods; ability to work in coordination with others without being distracted by them; and ability to interact appropriately with the general public were moderately limited.  (Id.).

### Evidence Presented to the Appeals Council Subsequent to the ALJ's Decison

Plaintiff presented to the Pain Management Center on February 4, 2004 for a follow-up regarding his low back pain and peripheral neuropathy.  (Tr. 281).  Ms. Russell noted that plaintiff had undergone rotator cuff repair since his last visit.  (Id.).  A physical examination revealed minimal tenderness to palpation of the lumbar region.  (Id.).  Plaintiff's motor strength was 5/5. (Id.).  Ms. Russell's assessment was low back pain; lower extremity radicular pain symptoms, due to degenerative disc disease of the lumbar spine; and peripheral neuropathy.  (Id.).  She recommended that plaintiff continue to take the Neurontin and continue exercised that he was taught in physical therapy.  (Id.).

Plaintiff saw Dr. Bradford on March 16, 2004.  (Tr. 257).  Plaintiff reported that he was sore from he fall he had sustained a week prior to his visit.  (Id.).  Dr. Bradford increased plaintiff's dosage of Naprosyn.[46]  (Id.).  On April 27, 2004, Dr. Bradford indicated that plaintiff presented to the emergency room on April 17, 2004, when he fell next to a lawnmower after his legs gave out.  (Tr. 256).  Dr. Bradford removed plaintiff's sutures and reported that the wound was healing well.  (Id.).

Plaintiff presented to the Pain Management Clinic on May 3, 2004, complaining of

---

[46]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis.  See PDR at 2874-75.

increasingly severe low back pain. (Tr. 279). A physical examination revealed tenderness to palpation at L3, L4, and L5, with no redness, inflamation or warmth. (Id.). Plaintiff's motor strength was 5/5 in the lower extremities. (Id.). Ms. Russell's assessment was low back pain with low extremity radiculopathy; degenerative disc disease of the lumbar spine, bulging disc; and peripheral neuropathy. (Id.). Ms. Russell recommended that plaintiff continue his pain medications and recommended an epidural steroid injection. (Id.). Dr. Yuli Soeter administered an epidural steroid injection on May 3, 2004, and on May 17, 2004. (Tr. 280, 277-78).

Plaintiff presented to Dr. Bradford on May 17, 2004, at which time he reported that he was experiencing trouble with his back. (Tr. 255). Dr. Bradford indicated that plaintiff's blood sugars were "doing well." (Id.). On June 28, 2004, plaintiff complained of chest pain. (Tr. 254). Dr. Bradford scheduled a stress test. (Id.).

On July 1, 2004, plaintiff saw Charles Lawson, M.D. for a consultation regarding his hyperlipidemia. (Tr. 250). Dr. Lawson's assessment was mixed hyperlipidemia. (Id.). Dr. Lawson stated that plaintiff's hyperlipidemia was caused in part by plaintiff's lack of compliance with his medications. (Id.).

On July 16, 2004, nuclear cardiac stress imaging revealed a small focus of inferior wall ischemia at the base of the heart and a normal ejection fraction. (Tr. 227). An EEG revealed no significant evidence of ischemia.[47] (Tr. 228).

On July 26, 2004, Donald Voelker, M.D. noted that a cardiac catherterization revealed mild left ventricular hypertrophy, mild left ventricular dilation, a left ventricular ejection fraction of 60 percent, and normal coronary arteries. (Tr. 229). Dr. Voelker recommended weight loss,

_____

[47]Local anemia due to mechanical obstruction of the blood supply. Stedman's at 924.

risk factor modification, and medical management.  (Id.).

Plaintiff saw Dr. Lawson on August 2, 2004.  (Tr. 230).  Dr. Lawson indicated that plaintiff's blood sugars were doing "quite well."  (Id.).  Dr. Lawson also noted that plaintiff's psychiatrist tapered him off Trazodone and that plaintiff felt better after stopping the Trazodone. (Id.).

Plaintiff saw Dr. Bradford in August and October of 2004 for treatment of his hyperlipidemia and diabetes.  (Tr. 237, 240-42).  On October 7, 2004, Dr. Bradford's assessment was Type II diabetes uncontrolled.  (Tr. 240).  On October 22, 2004, Dr. Bradford noted that plaintiff's blood sugars were very elevated.  (Tr. 237).

Plaintiff presented to the Pain Management Center on October 7, 2004.  (Tr. 274). Plaintiff continued to complain of pain in the low bak region that radiates down the lower extremities.  (Id.).  Upon physical examination, Ms. Russell found minimal tenderness to palpation of the lumbar spine.  (Id.).  Plaintiff's motor strength was 5/5.  (Id.).  Ms. Russell's assessment was low back pain; lower extremity radicular pain symptoms; degenerative disc disease of the lumbar spine;[48] and peripheral neuropathy.[49]  (Id.).  She recommended that plaintiff continue to take the Neurontin.  (Id.).

Plaintiff saw Dr. Bradford on November 1, 2004, at which time plaintiff reported that he was feeling somewhat better.  (Tr. 235).  Dr. Bradford's assessment was uncontrolled diabetes. (Id.).

---

[48]Degenerative changes in the spine, which results in back pain.  Stedman's at 467.

[49]Peripheral neuropathies can cause bilaterally symmetric diminished sensitivity, abnormal acuteness of sensitivity, abnormal sensation, loss of temperature and vibratory sense, or persistent severe burning pain.  See Stedman's at 1212.

In a letter dated November 3, 2004, Dr. Bradford stated that plaintiff suffers from a significant amount of pain with ambulation due to his chronic low back pain and peripheral neuropathy. (Tr. 233). Dr. Bradford indicated that plaintiff requires the use of a cane or walker at all times to assist with ambulation to prevent him from falling. (Id.). Dr. Bradford stated that plaintiff has a history of frequent falls and osteoporosis, which puts him at a high risk for fractures. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's depression, anxiety and mildly bulging lumbar disc are "severe" impairments, based upon the requirements in the Regulations (20 CFR §§ 404.1520 and 416.920).

4. The severity of these impairments does not meet or equal the severity of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity to perform light work that would require only occasional climbing, balancing, stooping knelling crouching and crawling and would allow for mild to moderate limitations in understanding and remembering tasks, sustaining concentration and persistence, socially interacting with general public and adapting to workplace changes.

7. The claimant is unable to perform his past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9.      The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.     The claimant retains the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include the representative light, unskilled occupations of cashier, rental clerk, janitorial labor and lawn work laborer; and the representative unskilled, sedentary occupations of assembler and hand work repair.  There are approximately 300,000 of these representative jobs in the national economy and 34,000 in the claimant's state.  The Administrative Law Judge finds that these jobs exist in significant numbers in the national economy.

13.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 18-19).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on August 25, 2003, the claimant is not entitled to a period of disability and Disability Insurance Benefits, under Sections 216(i) and 223, respectively, of the Social Security Act.

It is the further decision of the Administrative Law Judge that, based on the application filed on August 25, 2003, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838

(8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878

(8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

- 27 -

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.

See id.  If the claimant cannot perform his or her previous work, the final step involves a

determination of whether the claimant is able to perform other work in the national economy

taking into consideration the claimant's residual functional capacity, age, education and work

experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability

benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the

burden remains upon the claimant until s/he adequately demonstrates an inability to perform

previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's

ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059

(8th Cir. 1998).

     The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures

required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§

404.1520a (e), 416.920a (e).

     The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

C.    **Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision. Plaintiff first argues that the ALJ erred in disregarding the opinion of plaintiff's treating physician, Dr. Bradford. Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.

1.    **Opinion of Dr. Bradford**

As indicated above, plaintiff first argues that the ALJ failed to properly consider the

opinions of treating physician Dr. Bradford. Defendant contends that the ALJ properly considered the medical opinions of record.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "[t]he opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2)) (bracketed material in original). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148. Such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch, 201 F.3d at 1013.

Plaintiff contends that the ALJ erred in ignoring the opinion Dr. Bradford expressed in a letter dated November 3, 2004. (Tr. 233). The ALJ, however, issued his decision on October 28, 2004. (Tr. 20). Dr. Bradford's letter was provided to the Appeals Council subsequent to the ALJ's decision. As such, the ALJ did not "ignore" evidence that was not available at the time he rendered his decision.

The records of Dr. Bradford that were presented to the ALJ do not support Dr. Bradford's opinion. In the letter at issue, Dr. Bradford expressed the opinion that "[d]ue to his chronic low back pain and peripheral neuropathy, [plaintiff] suffers from a significant amount of pain with ambulation." (Tr. 233). Dr. Bradford further stated that plaintiff requires the use of a cane or a walker to assist with ambulation to prevent him from falling. (Id.). Dr. Bradford indicated that plaintiff "has a history of frequent falls and with is history of osteoporosis, this puts him at a high risk for fractures including the hip and spine." (Id.). None of Dr. Bradford's four treatment notes that were presented to the ALJ, however, include an assessment of chronic back pain or peripheral neuropathy, nor do they mention that plaintiff has a history of falls. (Tr. 144, 146, 149, 150). On September 12, 2003, the most recent record of Dr. Bradford's that the ALJ reviewed, plaintiff indicated that he was feeling well and that he had been walking for exercise. (Tr. 144).

Dr. Bradford's opinion is also not supported by the other objective medical evidence submitted to the ALJ. X-rays of the lumbosacral spine dated July 8, 2003 were within normal limits. (Tr. 160). Although plaintiff received regular treatment at the Pain Management Center, including epidural steroid injections, the treatment notes do not document difficulty with ambulation or frequent falls. In addition, treatment notes reveal that plaintiff's motor strength

was consistently 5 out of 5 and his sensation was intact to light touch.

The Appeals Council indicated that it had reviewed the additional evidence submitted by plaintiff, including Dr. Bradford's letter, and concluded that the evidence did not provide a basis for changing the ALJ's decision. (Tr. 4-7). This determination is supported by the medical record. First, as defendant points out, Dr. Bradford only mentioned plaintiff's back pain in her assessment in three out of fourteen treatment notes. (Tr. 235-59). Dr. Bradford does document two falls plaintiff sustained, the first occurring in March 2004, and the second in April 2004. (Tr. 256-57). The record does not reveal that Dr. Bradford prescribed a cane or any other ambulation device. As such, Dr. Bradford's own treatment notes from the time period subsequent to the ALJ's decision are not supportive of her opinion that plaintiff suffers from a significant amount of pain with ambulation due to his chronic low back pain and peripheral neuropathy and must use a cane or walker to assist with ambulation. Further, the other medical evidence submitted to the Appeals Council does not lend support to Dr. Bradford's opinion. Treatment notes from the Pain Management Clinic do not reveal that plaintiff's condition worsened since the ALJ issued his decision. Rather, plaintiff's motor strength continued to be 5 out of 5 and only mild tenderness of the lumbar spine, with no redness, inflammation, or warmth was noted. (Tr. 274, 279, 281).

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.      Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ erred in concluding that plaintiff could perform a

significant range of light work. Defendant argues that the ALJ made a proper Step Five determination.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

After discussing the objective medical evidence and plaintiff's own statements regarding his impairments, the ALJ concluded:

> [g]ranting the claimant the benefit of the doubt, the Administrative Law Judge finds that he retains the residual functional capacity to perform light work that would require only occasional climbing, balancing, stooping, kneeling, crouching and crawling and would allow for mild to moderate limitations in understanding and remembering tasks, sustaining concentration and persistence, socially interacting with [the] general public and adapting to workplace changes.

(Tr. 17). Plaintiff claims that the ALJ erred in not mentioning that light work requires a good deal of walking and standing.

"Light work" is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or

- 34 -

carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b); 416.967(b).

The ALJ's residual functional capacity assessment is supported by the record as a whole. First, the ALJ's determination that plaintiff is capable of performing light work is consistent with plaintiff's own testimony. Plaintiff testified that he could lift and carry up to twenty pounds. (Tr. 290). Plaintiff also testified that he walks around his house and walks down his street on a daily basis for exercise. (Tr. 297). Plaintiff indicated that he could not perform past work that involves standing constantly, or prolonged stooping or bending. (Tr. 300-01). With regard to his mental impairments, plaintiff testified that his depression and anxiety cause him to experience anxiety in public places. (Tr. 291, 306). As such, the ALJ's determination that plaintiff could perform light work with the restriction of only occasional climbing, balancing, stooping, kneeling, crouching and crawling; and mild to moderate limitations in understanding and remembering tasks, sustaining concentration and persistence, and socially interacting with the general public is consistent with plaintiff's testimony regarding his limitations.

The ALJ's determination is also supported by the medical record. None of plaintiff's physicians imposed any functional restrictions on plaintiff. As previously discussed, the medical record is not supportive of Dr. Bradford's opinion that plaintiff suffers from a significant amount of pain due to his low back pain and peripheral neuropathy and requires the use of a cane or a walker to assist with ambulation. Rather, x-rays of the lumbosacral spine dated July 8, 2003 were

within normal limits and treatment notes from the Pain Management Center reveal that plaintiff's motor strength was consistently 5 out of 5, with only mild tenderness of the lumbar spine, and no redness, inflammation, or warmth was noted. Further, the ALJ's determination is consistent with the opinion of the state agency consulting physician, Dr. Toll, who found that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and occasionally stoop and climb ladders, ropes, or scaffolds. (Tr. 188-190).

With regard to plaintiff's mental impairments, the medical record reveals that plaintiff's anxiety and depression improved with therapy and medication. In April 2003, plaintiff reported that his feelings of being "small on the inside" were getting better. (Tr. 164). In July 2003, plaintiff reported feeling 90 percent better since starting his medication regimen. (Tr. 163). Dr. Haiderzad described plaintiff's affect as pleasant at that time. (Id.). On September 15, 2003, plaintiff reported that is medications were working. (Tr. 162). Dr. Haiderzad described plaintiff's affect as pleasant and his speech as clear. (Id.). Dr. Toll expressed the opinion that plaintiff's depression and anxiety cause moderate limitations in his ability to maintain social functioning and ability to maintain concentration, persistence, or pace; mild limitations in his activities of daily living; and no repeated episodes of decompensation. (Tr. 206). The ALJ found that plaintiff's mental impairments cause mild to moderate limitations in understanding and remembering tasks, sustaining concentration and persistence, socially interacting with [the] general public and adapting to workplace changes. As such, the ALJ's determination regarding plaintiff's mental residual functional capacity is supported by the medical record.

Plaintiff also argues that the vocational testimony in this case cannot be considered

- 36 -

substantial evidence because the ALJ formulated an erroneous residual functional capacity.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. <u>See</u> <u>Howard v. Massanari</u>, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." <u>Id.</u> (citing <u>Taylor v. Chater</u>, 118 F.3d 1274, 1278 (8th Cir. 1997)).

 In this case, the undersigned has found that the ALJ's formulation of plaintiff's residual functional capacity was not supported by substantial evidence. The hypothetical question posed by the ALJ closely tracked the ALJ's assessment of plaintiff's residual functional capacity:

> So for purpose of claimant's potential entry-level work assume the claimant's 32 with a 12th grade education and is capable of performing light work with mild pain. Could occasionally climb, balance, stoop, kneel, crouch and crawl. And would have mild to moderate mental limitations for understanding and remembering tasks for sustained concentration and persistence, for socially interacting with the general public, for adapting to work place changes and using a regressive mental limitation scale of slight to mild to moderate to marked. Would there be entry-level work the claimant could perform and if so, what would the number of those jobs be?

(Tr. 304-05). The vocational expert responded in the affirmative. (<u>Id.</u>). This hypothetical question sets forth impairments supported by substantial evidence. Thus, the vocational expert's response to this question likewise constitutes substantial evidence supporting the ALJ's decision.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act be affirmed.

The parties are advised that they have eleven (11) days, until August 18, 2006, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  7th  day of August, 2006.

*Lewis M. Blanton*

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE